**KUZYK LAW, LLP**
Michael D. Braun (SBN 167416)
*mdb@kuzykclassactions.com*
2121 Avenue of the Stars, Ste. 800
Los Angeles, California 90067
Telephone:      (213) 401-4100
Facsimile:      (213) 401-0311

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RACHEL LUXTON and EILEEN PHAN on behalf of themselves and all others similarly situated,** | **CASE NO.:** 5:25-cv-4004 |
| | **CLASS ACTION** |
| **Plaintiffs,** | **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |
| v. | |
| **BB COMPANY** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

Plaintiffs Rachel Luxton and Eileen Phan ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, bring this class action against Defendant the BB Company, formerly known as the Better Body Company, ("BB" or "Defendant") and on the basis of personal knowledge, information and belief, and the investigation of counsel, allege as follows:

## INTRODUCTION

1.    This is a proposed class action on behalf of a nationwide, California and New York class (collectively, "Class") of consumers seeking redress for Defendant's deceptive practices associated with the advertising, labeling and sale of its Provitalize Probiotic Dietary Supplement ("Product" or "Supplement").

2.    BB characterizes Provitalize as a "natural probiotic & weight management dietary supplement" and markets it directly to women seeking to manage and mitigate symptoms of menopause.



COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF





"My clothes feel loose, my belly is getting smaller"

"Maximum support and relief during menopause"



"Better sleep, less bloating, and more stamina and energy"

3.    Provitalize claims to contain "clinically researched ingredients" in the form of an "everyday probiotic formula optimized for weight management and overall gut health." Among its label promises, are "sustained weight management" and "enhance[ment] [of] overall immune and gastrointestinal health" effectuated through "natural and safe ingredients at clinically effective doses."



MORE THAN A WEIGHT MANAGEMENT SUPPLEMENT*

With a combination of 10 specific probiotic strains and plant-based ingredients, Provitalize promotes and maintains healthy weight levels while revitalizing your gut microflora for sustainable weight management. *

KEY BENEFITS OF PROVITALIZE:
• Promotes sustained weight management*
• Enhances overall immune and gastrointestinal health*
• Natural & safe ingredients at clinically effective doses*

Formula encapsulated using DRcaps™ for unbeatable stomach acid resistance. Use together with a healthy diet and an active lifestyle.*

60 ACID-RESISTANT CAPSULES

4.      Defendant further touts these claims by promising probiotic ingredients at "clinically effective doses."

How MenoBliss Is Possible With Provitalize

Cutting Edge Science     Lab Research     Real World Results

Fat-Loss Specific Probiotic Strains

Out of hundreds of probiotic strains, Provitalize contains the most effective strains that work synergistically together to support weight management.

Absorption-Boosting Technology

Most probiotics and herbs don't get successfully absorbed by the body. Provitalize takes care of this problem by enhancing the bioavailability of the formula with absorption boosters. Whatever you swallow is whatever the body absorbs.

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF



**L. Gasseri SBT2055**

Supports management of abdominal fats [3]

**B.Breve IDCC04401**

May support healthy insulin sensitivity which may positively impact weight management [4]



**B.Lactis R101-8**

Supports bacterial balance in the gut

5.    BB assures consumers that the three probiotic strains (L. Gasseri SBT2055, B. Breve IDCC4401 and B. Lactis R101-8) collectively amount to no less than 68 billion colony forming units (*i.e.,* live probiotic bacteria), the potency of which is reaffirmed through Defendant's additional "shelf stable potency promise."





6.    Unfortunately for consumers, Provitalize's labels claims are false and misleading for at least three distinct reasons, any one of which independently renders the Product worthless.

7.    First, Plaintiffs conducted analytical tests on multiple lots of Provitalize to confirm the probiotic claims made on its label. The results demonstrate that the Product contains less than 20% of its promised probiotic CFU, rendering the promise of 68 billion CFU and the so-called "potency promise" patently false.



8.    Second, the number of colony forming units (CFU), which represents the number of live bacteria, is directly correlated with the probiotics' viability and ability to effectuate its stated purposes (*i.e., weight management, gut and immune health*). Failure to provide 68 billion CFU materially undermines Defendant's promise to provide consumers with "ingredients at clinically effective doses."

9.    Third, Provitalize makes a  number of promises regarding the Product's effectiveness for "weight management," and "immune and gastrointestinal health." These are voluntary structure-function claims which, by law, may be used by manufacturers to tout their products, but only if they can be substantiated with "competent and reliable scientific evidence." BB relies on four clinical studies to support the weight management and gut health claims it makes on the Product's label. Unfortunately, as detailed below, none of these studies independently or collectively provide

sufficiently competent and reliable scientific evidence necessary to support these claims, further rendering the Product's labels false and misleading, and the Product itself worthless.

10.    Recognizing that its formulation did not provide the promised 68 billion CFU, nor was supported by sufficiently competent and reliable scientific evidence, in late 2024  BB undertook a complete rebranding of the Product (1) eliminating all references to the amount of live bacteria in the Product (*i.e.,* 68 billion CFU); (2) removing potency promises; (3) abandoning its claims that the Product "promote[s] weight management" and "enhance[s] immune and gut health;" and (4) scrubbed promises of "clinically effective doses." The newly revised label completely alters the health focus of Provitalize from weight management, gut and immune health to something entirely new – "joint support."  Perhaps most shockingly, however, is not what Defendant changed on its label, but rather what it did not change. Despite these material labeling changes, the Provitalize formula remains exactly the same, a fact which highlights the labeling fraud that Defendant has perpetrated upon its consumers.

11.    As a result of this false and misleading labeling, Defendant was able to sell these Products to hundreds of thousands of unsuspecting consumers throughout California, New York and the United States.

12.    Plaintiffs allege Defendant's conduct is in breach of warranty, violates California's Business and Professions Code § 17200, *et. seq.,* California's Business & Professions Code § l7500, *et. seq.,* California Civil Code § 1750, *et seq*., N.Y. Gen. Bus. Law § 349 et seq.,  N.Y. Gen. Bus. Law § 350 et seq. and is otherwise grounds for restitution on the basis of quasi-contract/unjust enrichment.

## JURISDICTION AND VENUE

13.    Jurisdiction of this Court is proper under 28 U.S.C. § 1332(d)(2). Diversity jurisdiction exists as Plaintiff Phan is a resident of Boiceville, New York, Plaintiff Luxton is a resident of Pacific Grove, California, and Defendant BB Company has its principal place of business in Las Vegas, Nevada. The amount in controversy exceeds $5,000,000 for the Plaintiffs and members of the Class collectively, exclusive of interest and costs, by virtue of the combined

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF

purchase prices paid by Plaintiffs and members of the putative Class, and the profits reaped by Defendant from its transactions with Plaintiffs and the Class, as a direct and proximate result of the wrongful conduct alleged herein, and by virtue of the injunctive and equitable relief sought.

14. Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the underlying transactions and events complained of occurred and affected persons and entities located in this judicial district, and Defendant has received substantial compensation from such transactions and business activity in this judicial district.

## **PARTIES**

15. Plaintiff Rachel Luxton is a resident of Pacific Grove, California.

16. Ms. Luxton purchased Provitalize through Amazon.com on August 2, 2024.

17. Ms. Luxton read and believed the representations on the Product's labels, specifically that she was purchasing and receiving a Product that contained 68 billion viable CFU of the promised probiotics, that they were present in clinically effective doses and were otherwise clinically substantiated to support its weight management, immune and gut health claims.

18. Ms. Luxton specifically purchased the Product relying on its label claims.

19. Ms. Luxton believed that Defendant lawfully marketed and sold the Product.

20. Ms. Luxton relied on Defendant's labeling and was misled thereby.

21. Ms. Luxton would not have purchased the Product or would have purchased the Product on different terms had she known the truth about its contents.

22. Ms. Luxton was injured in fact and lost money as a result of Defendant's improper conduct.

23. If Ms. Luxton has occasion to believe that Defendant's marketing and labeling is truthful, non-misleading, and lawful, she would purchase the Product in the future.

24. Plaintiff Eileen Phan is a resident of Boiceville, New York.

25. Ms. Phan purchased Provitalize on several occasions. Most recently she purchased the Product directly through the BB Company website on September 17, 2023.

26.     Ms. Phan read and believed the representations on the Product's labels, specifically that she was purchasing and receiving a product that contained 68 billion viable CFU of the promised probiotics and that they were present in clinically effective doses and were otherwise clinically substantiated to support its weight management, immune and gut health claims.

27.     Ms. Phan specifically purchased the Product relying on its label claims.

28.     Ms. Phan believed that Defendant lawfully marketed and sold the Product.

29.     Ms. Phan relied on Defendant's labeling and was misled thereby.

30.     Ms. Phan would not have purchased the Product, or would have purchased the Product on different terms had she known the truth about its contents.

31.     Ms. Phan was injured in fact and lost money as a result of Defendant's improper conduct.

32.     If Ms. Phan has occasion to believe that Defendant's marketing and labeling is truthful, non-misleading, and lawful, she would purchase the Product in the future.

33.     Defendant BB Company (formerly known as the Better Body Company), manufactures, markets and sells a line of dietary supplements including Provitalize. The BB Company is headquartered in Las Vegas, Nevada and, upon information and belief, is a wholly owned subsidiary of Maneuver Marketing Pte Ltd, a Singaporean Company specializing in operating and scaling hyper-growth health and wellness e-commerce brands.[1]

## **ALLEGATIONS**

### A.     **The Market For Menopause Products**

34.     Menopause typically occurs 12 months after the last menstrual period of a woman. Perimenopause or menopausal transition refers to the years preceding menopause, during which women may experience alterations in their monthly cycles, and a variety of physical symptoms related to the onset of menopause. The menopausal transition typically begins between the ages of

---

[1] https://www.linkedin.com/company/maneuvermarketing/

45 and 55. Although it can last up to fourteen years, its typical duration is seven years. About 6,000 women in the United States reach menopause every day, totaling two million each year.

35.     It is no surprise therefore that the global menopause market size was valued at $17.66 billion in 2024 and is projected to reach $27.63 billion by 2033.[2]

36.     Marketers were quick to realize that there's a large number of well-educated women between the ages of 45 and 65 experiencing very bothersome menopause symptoms with a strong motivation to allay their effects and the financial resources to do so.[3]

37.     Of all the menopause targeted products on the market, supplements reign supreme. Some sources report that supplements account for 95 percent of the menopause market, while others estimate that of the more than $13 billion women spend annually addressing their menopause symptoms, more than $10 billion is spent on "nonmedical treatments."[4]

38.     Unfortunately, according to medical experts, including those at the National Institutes of Health and the Menopause Society, supplements have generally not been found to be effective at treating the symptoms of menopause. What's more, many menopause supplement companies are making menopause relief claims in marketing materials without proper scientific support and without proper approval, in violation of Federal Trade Commission and Food and Drug Administration mandates.[5]

---

[2] Straits Research, Menopause Market Size to Hit USD 27.63 Billion by 2033, November 21, 2024. Available at https://www.globenewswire.com/news-release/2024/11/21/2985347/0/en/Menopause-Market-Size-to-Hit-USD-27-63-Billion-by-2033-Straits-Research.html (last visited April 7, 2025).

[3] Salamon, M., Menopause supplements: Effective relief or empty promises?, Harvard Health Publishing September 1, 2024. Available at https://www.health.harvard.edu/womens-health/menopause-supplements-effective-relief-or-empty-promises (last visited April 7, 2025).

[4] Truth In Advertising, The Menopause Deception Epidemic. How the supplement industry is taking advantage of women and what TINA.org is doing to fight it, October 7, 2024. Available at https://truthinadvertising.org/articles/the-menopause-deception-epidemic/ (last visited April 7, 2025).

[5] Truth In Advertising, Consumer Alert: Menopause Supplements Proceed with caution when it comes to menopause marketing, October 7, 2024. Available at https://truthinadvertising.org/articles/consumer-alert-menopause-supplements/ (last visited April 7, 2025).

39.     Many dietary supplement brands tout their product's effectiveness in mitigating menopausal symptoms, but many such claims are utterly baseless – a form of false advertising dubbed "*meno-washing*" – the practice of marketing products that claim to provide relief to the symptoms of menopause but lack the scientific support to substantiate those claims. Such practices not only cause economic harm but may cause serious health consequences as women forego evidence-based medical care for unproven supplements. [6]

**B.      Probiotic Claims Are Highly Material To Reasonable Consumers**

40.     "Probiotics are live microorganisms that are intended to have health benefits when consumed or applied to the body." [7] They are often referred to as good bacteria in the gut which compete with bad bacteria to support the body in establishing optimal digestion and aid immune function.[8]

41.     Critically, for a probiotic to be effective, it must be: (a) alive when ingested, and (b) a strain that has been clinically studied and proven to provide the particular sought after benefits. Probiotic doses are measured in terms of colony forming units ("CFUs"), which represent the number of live and active micro-organisms in one serving of a probiotic. Probiotics are identified by their specific strain, which includes the genus, the species, and the subspecies. Through this

---

[6] Truth In Advertising, The Menopause Deception Epidemic. How the supplement industry is taking advantage of women and what TINA.org is doing to fight it, October 7, 2024. Available at https://truthinadvertising.org/articles/the-menopause-deception-epidemic/; Salamon, M., Menopause supplements: Effective relief or empty promises?, Harvard Health Publishing September 1, 2024. Available at https://www.health.harvard.edu/womens-health/menopause-supplements-effective-relief-or-empty-promises.

[7] *Probiotics: What You Need to Know*, National Center for Complementary and Integrative Health, U.S. Department of Health and Human Services. Available at https://www.nccih.nih.gov/health/probiotics-what-you-need-to-know (last visited March 25, 2024).

[8] *An Introduction to Probiotics, Mayo Clinic Health System*, July 13, 2022. Available at https://www.mayoclinichealthsystem.org/hometown-health/speaking-of-health/an-introduction-to-probiotics (last visited April 7, 2025).

identification process specific strains can be linked with their specific effects, similar but not identical species can be differentiated so that clinically supported benefits are not misattributed. [9]

42.    As a result of shifting dietary preferences toward healthier foods coupled with rising consumer awareness about digestive health products, probiotics have become increasingly popular. [10]

43.    The global market for probiotics is expected to reach $220 billion by 2030 up from an estimated 77 billion in 2022. [11]

44.    Menopausal women are increasingly seeking out dietary supplements containing probiotics to help manage a variety of symptoms associated with menopause. This trend is driven by a growing awareness of the connection between the gut microbiome and hormonal changes during menopause, as well as the potential benefits that certain probiotic strains offer for alleviating symptoms such as weight gain, digestive issues, mood swings, and vaginal health concerns. [12]

45.    While some probiotics can be beneficial, they must be clinically validated strains at appropriate doses and are often used alongside other interventions such as a balanced diet, regular exercise, or botanical supplements. Women are advised to choose products.

---

[9] Goldman, E. (Ed.), Green, L. (Ed.). (2015). *Practical Handbook of Microbiology*, Third Edition. Boca Raton: CRC Press. A colony forming unit, or CFU, is a measurement of viable microbial cells that are capable of replicating on agar plates and forming colonies which are then counted.

[10] Grand View Research, Probiotics Market Size, Share & Trends Analysis Report By Product (Food & Beverages, Dietary Supplements), By Ingredient (Bacteria, Yeast), By Distribution Channel, By End-use, By Region, And Segment Forecasts, 2023 – 2030. Available at https://www.grandviewresearch.com/industry-analysis/probiotics-market (last visited March 20, 2023).

[11] Grand View Research, Probiotics Market Size To Reach $220.14 Billion By 2030, August 2023. Available at https://www.grandviewresearch.com/press-release/global-probiotics-market (last visited March 25, 2024).

[12] Nutritional Outlook, Probiotics for menopause heats up: 2023 SupplySide West Report, November 8, 2023. Available at https://www.nutritionaloutlook.com/view/probiotics-for-menopause-heats-up-2023-supplyside-west-report (last visited March 25, 2024).

**C.     Plaintiffs' Analytical Testing Reveal That Products Do Not Contain The 62 Billion CFU Promised On The Product Label**

46.     Plaintiffs conducted analytical tests on multiple samples of multiple lots of Provitalize, the results of which unequivocally demonstrate that the amount of live bacteria (*i.e.,* CFU) in the Products is materially lower than promised, not only rendering the label claim promise of "62 Billion CFU" false but undermining potential health benefits those probiotics were intended to provide.

47.     Plaintiffs conducted analytical testing on 12 samples of Defendant's Product across 3 Production lots, the results of which demonstrate the CFU count to be materially below (*i.e.,* at best 80% less than) the promised 62 billion CFU label claim. [13]

| LOT NUMBER | CFU |
|---|---|
| PR7751-254-2A | 238,000,000 |
| PR4438-101-2 | 11,150,002,300 |
| PR7751-254-3A | 27,022,000 |

48.     Failure to provide the promised 62 billion CFU renders the Defendant's label claim literally false and also undermines the efficacy and ability of the Product to live up to its promises to assist with weight management, and enhancement of overall immune and gastrointestinal health.

**D.     Provitalize's Claims Are Also Unsubstantiated**

49.     Even if Defendant properly manufactured its Product to meet its label claim – *i.e.* 62 billion CFU of live probiotic bacteria, Defendant's claims that promise "clinically effective doses" to "promote weight management" and "enhance immune and gut health;" are unsubstantiated by scientific evidence rendering such claims false and misleading.

---

[13] Although not required to do so, Plaintiff conducted testing consistent with the FDA's protocol under   21 C.F.R. §101.9(g)(2). The specific lot numbers tested were transmitted to Defendant in the form of a demand pursuant to N.Y. Express Warranty Demand on or about January 6, 2025.

50.     Provitalize claims to contain 3 probiotic strains, L. Gasseri SBT2055, B. Breve IDCC4401 and B. Lactis R101-8, in a proprietary symbiotic blend collectively amounting to 62.8 Billion CFU designed to "promote healthy weight levels while revitalizing your gut microflora for sustainable weight management." According to its website, Provitalize's probiotic "blend" consists of "1 billion viable cells (CFUs) of *L. gasseri* SBT2055, 50 billion CFUs of *B. breve* IDCC 4401, 17.2 billion CFUs of *B. lactis* R101-8, a formulation which Defendant describes as "clinically researched ingredients at clinically effective doses." [14]

21) What are the exact ingredients that go into Provitalize?

**Probiotics**: L.Gasseri SBT 2055 (1 Billion CFU), B. Breve IDCC 4401 (50 billion CFU), B. Lactis R108 (17.2 Billion CFUs), (68.2 Billion CFU)

51.     According to the Product's label, the "Key Benefits of Provitalize" are that it: "Promotes sustained weight management," "Enhances overall immune and gastrointestinal health," and provides "natural and safe ingredients at clinically effective doses." Defendant boldly affirms on the Product's principal display panel that its "ingredients" have been "clinically researched" to support these claims.  To that end, Provitalize cites to 4 clinical studies to support these claims. [15]

---

[14] https://thebbco.com/pages/pp-provitalize-j?nbt=nb%3Aadwords%3Ag%3A20726843415%3A158163412987%3A703916359140&nb_adtype=&nb_kwd=provitalize&nb_ti=kwd-410264234336&nb_mi=&nb_pc=&nb_pi=&nb_ppi=&nb_placement=&nb_si={sourceid}&nb_li_ms=&nb_lp_ms=&nb_fii=&nb_ap=&nb_mt=e&gc_id=20726843415&h_ad_id=703916359140&utm_source=google&utm_medium=cpc&utm_id=20726843415&utm_term=provitalize&utm_content=brand&utm_campaign=703916359140&gad_source=1&gclid=CjwKCAjwvr--BhB5EiwAd5YbXjViy0XEHLMr1FkYLU00ZTRM-hgv51blfCShjPaMTs-PXPoeF2gn_xoCl-cQAvD_BwE#ingredients (last visited May 8, 2025)

[15] https://thebbco.com/pages/pp-provitalizej?nbt=nb%3Aadwords%3Ag%3A20726843415%3A158163412787%3A705990575899&nb_adtype=&nb_kwd=provitalize%20probiotic&nb_ti=kwd2227772706955&nb_mi=&nb_pc=&nb_pi=&nb_ppi=&nb_placement=&nb_si={sourceid}&nb_li_ms=&nb_lp_ms=&nb_fii=&nb_ap=&nb_mt=p&gc_id=20726843415&h_ad_id=705990575899&utm_source=google&utm_medium=cpc&utm_id=20726843415&utm_term=provitalize%20probiotic&utm_content=brand&utm_campaign=7059905 75899&gad_source=1&gclid=Cj0KCQjw-e6-

---

As demonstrated below, however, none of these studies meet the minimum substantiation standards of "competent and reliable scientific evidence" sufficient to support these claims.

      **1.**      **Defendant's Scientific Evidence Fails to Meet Minimum Substantiation Standards Set Forth by the U.S. Food & Drug Administration and Federal Trade Commission Guidance**

52.     Section 403(r)(6) of the Federal Food, Drug, and Cosmetic Act ("FDCA") (21 U.S.C. 343(r)(6)) requires that a manufacturer of a dietary supplement making a nutritional deficiency, structure/function, or general well-being claim have substantiation that the claim is truthful and not misleading. To that end, Food and Drug Administration ("FDA") issued a Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r) (6) of the Federal Food, Drug, and Cosmetic Act, January 2009 ("FDA Guidance") which is "modeled on, and complements, a similar guidance document promulgated by the Federal Trade Commission ("FTC"). Together, they offer guidance as to the proper substantiation of Claims made on dietary supplement labels and advertisements.[16]

> The FTC has typically applied a substantiation standard of "competent and reliable scientific evidence" to claims about the benefits and safety of dietary supplements and other health-related products. FDA intends to apply a standard for the substantiation of dietary supplement claims that is consistent with the FTC approach.
>
> In determining whether the substantiation standard has been met with competent and reliable scientific evidence, we recommend that firms consider the following issues in their assessment: (1) the meaning of the claim(s) being made; (2) the relationship of the evidence to the claim; (3) the quality of the evidence; and (4) the totality of the evidence.

BhDmARIsAOxxlxXvSaFSy9mpvZeUvmhGbqKlZiehJx5QbZI3A9KQRA9lSiwnn51DGSUaAkZEEALw_wcB (last visited March 1, 2025)

[16] Available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-substantiation-dietary-supplement-claims-made-under-section-403r-6-federal-food

53.     With respect to Section (2) the ***relationship of the evidence to the claim***, FDA guides that any claims relying on scientific evidence should be based on "similarities in formulation, serving size, route of administration, total length of exposure, and frequency of exposure. Manufacturers should be aware that other substances involved in the study or included in the dietary supplement product itself might also affect the dietary supplement's performance or the study results." *Id.* FDA further cautions that it is important to also consider whether the studies are "based on a population that is similar to that which will be consuming the dietary supplement product." *Id.*

54.     With respect to the third requirement (3) **quality of the evidence**, the "gold standard" is a "randomized, double blind, placebo-controlled trial design." While [a]nimal studies may provide useful background on the biological effects of a substance, …they often have limited or unknown value in predicting the effect of the substance in humans" (Example 13). Similarly, with respect to in vitro studies – those that are done outside a living body (e.g., studies that examine a product's effect on isolated cells or tissues),  "are of limited value in predicting the effect of a substance when consumed by humans" (Example 15). *Id.*

55.     The FTC further illuminates the substantiation standard in its FTC Dietary Supplements: An Advertising Guide for Industry ("FTC Guide").[17]

> The role of the Federal Trade Commission, which enforces laws outlawing unfair or deceptive acts or practices, is to ensure that consumers get accurate information about dietary supplements so that they can make informed decisions about these products.
>
> All parties who participate directly or indirectly in the marketing of dietary supplements have an obligation to make sure that claims are presented truthfully and to check the adequacy of the support behind those claims.
>
> The FTC's truth-in-advertising law can be boiled down to two common-sense propositions: 1) advertising must be truthful and not misleading; and 2) before disseminating an ad, advertisers must have adequate substantiation for all objective product claims.

---

[17] https://www.ftc.gov/system/files/documents/plain-language/bus09-dietary-supplements-advertising-guide-industry.pdf

**Substantiating Claims**

The FTC's standard for evaluating substantiation is sufficiently flexible to ensure that consumers have access to information about emerging areas of science. At the same time, it is sufficiently rigorous to ensure that consumers can have confidence in the accuracy of information presented in advertising. A number of factors determine the appropriate amount and type of substantiation, including:

The Type of Product. Generally, products related to consumer health or safety require a relatively high level of substantiation.

The Type of Claim. Claims that are difficult for consumers to assess on their own are held to a more exacting standard. Examples include health claims that may be subject to a placebo effect or technical claims that consumers cannot readily verify for themselves.

The FTC typically requires claims about the efficacy or safety of dietary supplements to be supported with competent and reliable scientific evidence…..


**The Relevance of the Evidence to the Specific Claim**

A common problem in substantiation of advertising claims is that an advertiser has valid studies, but the studies do not support the claim made in the ad. Advertisers should make sure that the research on which they rely is not just internally valid, but also relevant to the specific product being promoted and to the specific benefit being advertised. Therefore, advertisers should ask questions such as: How does the dosage and formulation of the advertised product compare to what was used in the study? Does the advertised product contain additional ingredients that might alter the effect of the ingredient in the study? Is the advertised product administered in the same manner as the ingredient used in the study? Does the study population reflect the characteristics and lifestyle of the population targeted by the ad? If there are significant discrepancies between the research conditions and the real life use being promoted, advertisers need to evaluate whether it is appropriate to extrapolate from the research to the claimed effect.

56.    As detailed below, none of the four studies relied on by Defendant meet the level of substantiation set forth by the FDA and FTC and thereby fail to provide sufficient scientific evidence sufficient to support the claims made on their Product labels, rendering these claims false, misleading and unlawful under state consumer protection laws alleged herein.

### 2. Defendant's Studies Do Not Provide Adequate Scientific Evidence to Substantiate Label Claims. [18]

57. The Provitalize website references each of the three probiotic strains in its Product and provides citations to the clinical studies that ostensibly substantiate the claims made on its Product labels (*e.g.,* weight management, improve gut and immune health, etc.). They are as follows:

> **Strain #1: L. Gasseri SBT2055** is a rare probiotic strain found in small amounts in fermented foods like Puba (a Brazilian staple). Two clinical trials involving 87 and 210 people respectively showed a 4.6%[19] and 8.5%[20] reduction in abdominal fat after weeks of consuming L. Gasseri. They also observed measurable improvements in waist and hip circumference. [19]

> **Strain #2: B. Breve IDCC4401** is naturally found in our digestive tract. A group of Korean scientists observed improvements in cholesterol metabolism and lower cholesterol levels.[20]

> **Strain #3: B. Lactis R101-8** was studied by a group of German researchers and was found to metabolize saturated fatty acids.[21]

---

[18] https://thebbco.com/pages/pp-provitalize-j?nbt=nb%3Aadwords%3Ag%3A20726843415%3A158163412787%3A705990575899&nb_adtype=&nb_kwd=provitalize%20probiotic&nb_ti=kwd-2227772706955&nb_mi=&nb_pc=&nb_pi=&nb_ppi=&nb_placement=&nb_si={sourceid}&nb_li_ms=&nb_lp_ms=&nb_fii=&nb_ap=&nb_mt=p&gc_id=20726843415&h_ad_id=705990575899&utm_source=google&utm_medium=cpc&utm_id=20726843415&utm_term=provitalize%20probiotic&utm_content=brand&utm_campaign=705990575899&gad_source=1&gclid=Cj0KCQjw-e6-BhDmARIsAOxxlxXvSaFSy9mpvZeUvmhGbqKlZiehJx5QbZI3A9KQRA9lSiwnn51DGSUaAkZEEALw_wcB (last visited March 20, 2025).

[19] Kadooka Y, Sato M, Imaizumi K, Ogawa A, Ikuyama K, Akai Y, Okano M, Kagoshima M, Tsuchida T. Regulation of abdominal adiposity by probiotics (Lactobacillus gasseri SBT2055) in adults with obese tendencies in a randomized controlled trial. Eur J Clin Nutr. 2010 Jun;64(6):636-43. doi: 10.1038/ejcn.2010.19. Epub 2010 Mar 10. PMID: 20216555 (Kadooka 2010); Kadooka Y, Sato M, Ogawa A, Miyoshi M, Uenishi H, Ogawa H, Ikuyama K, Kagoshima M, Tsuchida T. Effect of Lactobacillus gasseri SBT2055 in fermented milk on abdominal adiposity in adults in a randomised controlled trial. Br J Nutr. 2013 Nov 14;110(9):1696-703. doi: 10.1017/S0007114513001037. Epub 2013 Apr 25. PMID: 23614897 (Kadooka 2013)

[20] In-Hwan Joo, Min-Goo Kim, Jong-Min Park, Ga-Yul Min, Su-Hyun Han, Su-Bin Lee, Boo-Yong Sim, Jung-Hwan Kim, Dong-Hee Kim, Bifidobacterium breve strain IDCC 4401 improves dyslipidemia in rat model. Int J Clin Exp Med 2020;13(6):4137-4144 ("In-Hwan Study"). Accessed on Mar 1 2023. https://e-century.us/files/ijcem/13/6/ijcem0110249.pdf

[21] Ghadimi D, Nielsen A, Hassan MFY, Fölster-Holst R, Ebsen M, Frahm SO, Röcken C, de Vrese M, Heller KJ. Modulation of Proinflammatory Bacteria- and Lipid-Coupled Intracellular Signaling Pathways in a Transwell Triple Co-Culture Model by Commensal Bifidobacterium Animalis R101-

58.     As detailed below, each study is deficient in *at least one* material respect that fatally undermines Defendant's ability to reply on the study to support its structure/function claims.

a.     **L. Gasseri SBT2055**

59.     The weight management claims asserted by Defendant are based on 2010 and 2013 studies by Kadooka, et al. The Studies fail to meet several substantiation standards set forth by the FDA and FTC thereby rendering their findings inapposite to the claims made by Defendant.  For example:

a.   Neither Kadooka 2010, nor Kadooka 2013 were conducted on menopausal women. The 2010 study involved men and women ages 18-55 of Japanese descent. The 2013 Study involved men and women aged 35-60 of Japanese descent. Half of both study participants were male. A significant portion of the remaining women were not of menopausal age.

b.   The only commonality among study group participants was their level of obesity. The 2010 Study examined adults with obese tendencies, defined by a body mass index between 24.2 and 30.7 kg/m and abdominal visceral fat areas ranging from 81.2 to 178.5 cm. The 2013 the study examined obese Japanese adults with large visceral fat areas (80.2 to 187.8 cm).

c.   The Study sizes are small and statistically irrelevant to women and a subset of women with menopausal symptoms. The 2010 Study involved 87 participants. The 2013 Study involved 220 participants. Half of the study cohort were males and the number of female participants within the menopausal range was negligible. The Studies did not indicate whether any of the female participants who were in a menopausal age range, were actually in menopause or could otherwise attribute their weight to menopause.

---

8. Antiinflamm Antiallergy Agents Med Chem. 2021;20(2):161-181. doi: 10.2174/1871523019999201029115618. PMID: 33135616 ("Ghadimi Study").

d.  Both studies tested *Lactobacillus gasseri* SBT2055 in a fermented milk (FM) matrix, which already contained a high concentration of probiotic bacteria from traditional yogurt cultures. Participants consumed 200 grams per day of fermented milk which contained anywhere from 200 million to 20 billion CFU of probiotic bacteria distinct from *Lactobacillus gasseri* SBT2055. The fact that *Lactobacillus gasseri* SBT2055 was combined with fermented milk, as opposed to examined alone in a pill form, or in conjunction with the other ingredients used in Provitalize further renders its findings inapposite to the claims made by Defendant.

e.  The 2010 Study provided 20 billion CFU of *Lactobacillus gasseri* SBT2055 to study participants every day for 12 weeks. Provitalize, by its own admission, provides at most 1 billion CFU of *Lactobacillus gasseri* SBT2055 in its dosage, far below the CFU given test subjects in the 2010 Study. While the 2013 Study analyzed two groups, one that received 2 billion CFU a day and the other 200 million CFU per day, Plaintiff's test results show that there was never more than 90 million CFU of L. *gasseri* present in Provitalize Products, further rendering the findings of the 2013 Study inapposite.

60.  Competent and reliable scientific evidence in this context would require Defendant to provide studies using the same form, same potency and conditions as the marketed product, none of which are satisfied by the Kadooka Studies.

**b.**                    **B. Breve IDCC4401**

61.  The In-Hwan Study underlying the B. Breve IDCC4401 claims was an animal study on male rats that had been fed a high-fat/high-fructose diet. No human data was presented at all, much less data attributable to menopausal women. Under basic FTC/FDA substantiation requirements, such an animal study has no bearing on B. Breve effects on humans and cannot be used to substantiate any health-related claims.

c.                    **B. Lactis R101-8**

62.    Finally, the Ghadimi Study was an in vitro study which does not directly test the effects of probiotics in humans or animals. It does not involve actual human subjects or populations (no age, gender, ethnicity, or dosage data in vivo).  Therefore, it offers no information on dosage, bioavailability, or clinical outcomes in real-world settings. There is no evidence of health outcomes. Structure/function or risk-reduction claims require studies that show observable effects in people. This specific strain has not yet been studied in humans and cannot therefore be generalized to clinical efficacy in humans, especially not in a specific population like menopausal women.

63.    At bottom, none of the four Studies relied on by Defendant individually or collectively meet FTC/FDA Guidance for "competent and reliable scientific evidence" necessary to substantiate the claims made by Provitalize rendering such claims false, misleading and unlawful.

## E.    PROVITALIZE REBRAND

64.    In or around late 2024 Defendant began a rebranding which included a name change from the Better Body Company to the BB Company. Along with the name change, Defendant rebranded the Provitalize Product changing its label in materially significant ways. All the offending statements highlighted in this Complaint have been removed from Provitalize's rebranded Product, despite the fact that the Provitalize formulation remains exactly the same.

65.    Below, is a chart comparing the front, back and side labels of Provitalize's "Old" and "New" labels. For ease of reference, claims made on the "Old" label that have been eliminated on the "New" label are highlighted in red.[22]  As is clear from the chart, BB has now eliminated every offending claim that Plaintiffs here allege to be false, misleading and unlawful. This complete rebranding of Provitalize from a weight management and gut health probiotic to a "joint" supplement only highlights the false and misleading nature of its labeling over the past several years and the fraud it has committed upon its consumers.

---

[22] According to BB advertisement, the "Old" label with false and misleading representation was still being disseminated to unsuspecting consumers through March 31, 2025. "As we makeover from Better Body Co. to BB Company, you may still receive packaging with the old branding until March 31, 2025, to reduce waste."

| ORIGINAL LABEL CLAIMS | NEW LABEL CLAIMS |
|---|---|
| **PRINCIPAL DISPLAY PANEL** | **PRINCIPAL DISPLAY PANEL** |
| Clinically researched ingredients | n/a |
| Weight Management Complex \| ID strains \| 68 Billion CFU | Unique Formula \| ID Strains |
| Everyday probiotic formula optimized for weight management & overall gut health | Everyday probiotic formula |
| Natural Probiotic & Weight Management | n/a |
| **SUPPLEMENT FACTS PANEL** | **SUPPLEMENT FACTS PANEL** |
| Probiotic Blend (68.2 Billion CFU) | Probiotic Blend |
| Shelf-Stable Potency Promise | n/a |
| **SIDE PANEL** | **SIDE PANEL** |
| More than a weight management supplement | More than Just a Probiotic |
| With a  combination of ID specific probiotic strains and plant-based ingredients, Provitalize promotes and maintains health weight levels while revitalizing your gut microflora for sustainable weight management | With a  combination of ID specific probiotic strains and plant-based ingredients, Provitalize promotes holistic support for overall health  - with a gut centric approach |
| KEY BENEFITS OF PROVITALIZE[23]<br><br>(1) Promotes sustained weight management<br>(2) Enhances overall immune and gastrointestinal health<br>(3) Natural and safe ingredients at clinically effective doses | KEY BENEFITS OF PROVITALIZE<br><br>(1) Clothes may start fitting better<br>(2) May support overall immune and gastrointestinal health<br>(3) May support overall joint comfort and flexibility |

[23] Numbering does not appear on either label but is added here to both labels for clarity.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    66.    In addition to materially changing its label, BB has refocused its entire marketing

17  campaign away from weight management, gastrointestinal health and immunity to promoting "Joint

18  Support" - something previously never referenced on Provitalize labels or emphasized in its

19  marketing. The abandonment of claims regarding clinically researched ingredients and promises to

20  promote sustained weight management gut and enhance overall immune and gastrointestinal health

21  while maintaining the exact same formulation is a concession that there was never a basis for making

22  these claims, and that Defendant perpetrated a fraud on its consumers.

23
24
25
26
27
28



[24]

The Most Misunderstood Menopause Symptoms is Joint Discomfort

Women over 40 are TWICE as likely to experience joint issues as men[1]. But many women and doctors still associate stiff joints and achy bones with aging and fibromyalgia[2].

**F.     No Adequate Remedy At Law**

67.     Plaintiffs and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

68.     Broader Statutes of Limitations. The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitations for damages claims under the CLRA.

69.     Broader Scope of Conduct. The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. The UCL creates a

---

[24] https://thebbco.com/pages/pp-provitalize-j?nbt=nb%3Aadwords%3Ag%3A20726843415%3A158163412787%3A705990575899&nb_adtype=&nb_kwd=provitalize%20probiotic&nb_ti=kwd-2227772706955&nb_mi=&nb_pc=&nb_pi=&nb_ppi=&nb_placement=&nb_si={sourceid}&nb_li_ms=&nb_lp_ms=&nb_fii=&nb_ap=&nb_mt=p&gc_id=20726843415&h_ad_id=705990575899&utm_source=google&utm_medium=cpc&utm_id=20726843415&utm_term=provitalize%20probiotic&utm_content=brand&utm_campaign=705990575899&gad_source=1&gclid=Cj0KCQjw-e6-BhDmARIsAOxxlxXvSaFSy9mpvZeUvmhGbqKlZiehJx5QbZI3A9KQRA9lSiwnn51DGSUaAkZEEALw_wcB (last visited March 20, 2024)

cause of action for violations of other laws (*e.g.,* Sherman Law), which does not require, among other things, that a reasonable consumer would have been deceived in order to establish a violation. Thus, Plaintiffs and Class members may be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (*e.g.,* the FAL requires actual or constructive knowledge of the falsity; the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes and other statutorily enumerated conduct).

70.    Injunctive Relief to Cease Misconduct and Dispel Misperception. Injunctive relief is necessary to prevent Defendant from continuing to engage or re-engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm).

71.    Further, injunctive relief, in the form of affirmative disclosures, are necessary to dispel the public misperception about the Product that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements that the Product's challenged representations are not true and provide accurate information about the Product's true nature; and/or requiring prominent qualifications and/or disclaimers on the Product's label concerning the Product's true nature.

72.    An injunction requiring affirmative disclosures to dispel the public's misperception and prevent the ongoing deception and repeat purchases based thereon, is also not available through a legal remedy (such as monetary damages).

73.    Procedural Posture—Incomplete Discovery & Pre-Certification. Lastly, this is an initial pleading and discovery has not yet commenced. No class has been certified. No expert discovery has commenced. The completion of fact and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Plaintiffs' individual claims and any certified class. Plaintiffs therefore reserve their right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either Plaintiffs and/or any certified class. Such proof, to the extent

1    necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an

2    order granting equitable relief.

3

4                                    **ECONOMIC INJURY**

5        74.    Plaintiffs sought to buy products that were lawfully labeled, marketed and sold.

6        75.    Plaintiffs saw and relied on Defendant's misleading labeling of its Products.

7        76.    Plaintiffs believed that the Products they purchased contained the promised 68 billion

8    CFU of the 3 strains of probiotics at clinically effective doses to support the various

9    structure/function claims made by Provitalize. They also rightfully believed that BB had substantive

10   scientific evidence to support the underlying claims.

11       77.    Plaintiffs believed that the Products were lawfully marketed and sold.

12       78.    Plaintiffs received Products that were unlawfully marketed and sold.

13       79.    In reliance on the claims made by Defendant regarding the qualities of its Products,

14   Plaintiffs paid a price premium.

15       80.    As a result of their reliance on Defendant's misrepresentations, Plaintiffs received

16   Products that lacked the promised ingredients which they reasonably believed they contained.

17       81.    Plaintiffs lost money and thereby suffered injury as they would not have purchased

18   these Products and/or paid as much for them absent the misrepresentation.

19       82.    Defendant knows that the inclusion of probiotics in general along with the specific

20   health related claims regarding the effectiveness of those probiotics are material to consumers'

21   purchasing decisions.

22       83.    Plaintiffs altered their positions to their detriment and suffered damages in an amount

23   equal to the amounts they paid for the Products they purchased, and/or in additional amounts

24   attributable to the deception.

25       84.    By engaging in the false and deceptive conduct alleged herein Defendant reaped, and

26   continues to reap financial benefits in the form of sales and profits from its Products.

27       85.    Plaintiffs, however, may be willing to purchase Provitalize again in the future should

28   only they be able to rely on Defendant's marketing as truthful and non-deceptive.

## CLASS ACTION ALLEGATIONS

86.     Plaintiffs bring this action on behalf of themselves and on behalf of classes of all others similarly situated consumers defined as follows:

      a.  **National**: All persons in the United States who purchased Provitalize in the United States during the Class Period.

      b.  **California:** All persons in California who purchased Provitalize in California during the Class Period.

      c.  **New York:** All persons in New York who purchased Provitalize in New York during the Class Period.

      d.  **Class Period** is the maximum time allowable as determined by the statute of limitation periods accompanying each cause of action.

87.     Plaintiffs bring this Class pursuant to Federal Rule of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3) and 23(c)(4).

88.     Excluded from the Classes are: (i) Defendant and its employees, principals, affiliated entities, legal representatives, successors and assigns; and (ii) the judges to whom this action is assigned.

89.     Upon information and belief, there are tens of thousands of members of the Class. Therefore, individual joinder of all members of the Class would be impracticable.

90.     There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

91.     Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common legal or factual questions include but are not limited to:

      a.  Whether Defendant marketed, packaged, or sold Provitalize  to Plaintiff and those similarly situated using false, misleading, or deceptive statements or representations;

      b.  Whether Defendant omitted or misrepresented material facts in connection with the sales of its Products;

c.   Whether Defendant participated in and pursued the common course of conduct complained of herein;

d.   Whether Defendant has been unjustly enriched as a result of its unlawful business practices;

e.   Whether Defendant's actions violate the Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq*. (the "UCL");

f.   Whether Defendant's actions violate the False Advertising Law, Cal. Bus. & Prof. Code §§17500, *et seq*. (the "FAL");

g.   Whether Defendant's actions violate the Consumers Legal Remedies Act, Cal. Civ. Code §§1750, *et seq*. (the "CLRA");

h.   Whether Defendant's actions violate N.Y. GEN. BUS. LAW § 349 et seq;

i.   Whether Defendant's actions violate N.Y. GEN. BUS. LAW § 350 et seq;

j.   Whether Defendant should be enjoined from continuing the above-described practices;

k.   Whether Plaintiffs and members of the Class are entitled to declaratory relief; and

l.   Whether Defendant should be required to make restitution, disgorge profits, reimburse losses, and pay damages as a result of the above-described practices.

92.   Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs were consumers who purchased Defendant's Products. Plaintiffs are no different in any relevant respect from any other Class member who purchased the Products, and the relief sought is common to the Class.

93.   Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent, and they have retained

1   counsel competent and experienced in conducting complex class action litigation. Plaintiffs and their

2   counsel will adequately protect the interests of the Class.

3       94.    A class action is superior to other available means for the fair and efficient

4   adjudication of this dispute. The damages suffered by each individual Class member likely will be

5   relatively small, especially given the relatively small cost of the Products at issue and the burden and

6   expense of individual prosecution of the complex litigation necessitated by Defendant's conduct.

7   Thus, it would be virtually impossible for members of the Class individually to effectively redress

8   the wrongs done to them. Moreover, even if members of the Class could afford individual actions, it

9   would still not be preferable to class-wide litigation. Individualized actions present the potential for

10  inconsistent or contradictory judgments. By contrast, a class action presents far fewer management

11  difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive

12  supervision by a single court.

13      95.    In the alternative, the Class may be certified because Defendant has acted or refused

14  to act on grounds generally applicable to the Class, thereby making appropriate preliminary and final

15  equitable relief with respect to each Class.

16      96.    The requirements for maintaining a class action pursuant to Rule 23(b)(2) are also

17  met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby

18  making appropriate final injunctive relief or corresponding declaratory relief with respect to the

19  Class as a whole.

## FIRST CAUSE OF ACTION
### (Breach of Express Warranty)

97.    Plaintiffs incorporate each and every allegation contained in the paragraphs above as

if restated herein.

98.    Plaintiffs' express warranty claims are based on violations of N.Y. CLS UCC § 2-313

and § 2-607 and Cal. Com. Code §2313. Defendant was afforded reasonable notice of this claim in

advance of the filing of this complaint.

99.     Defendant made express warranties to Plaintiffs and members of the Class that the Products they purchased contained more than 68 billion CFU of 3 probiotic strains; the Product contained Clinically researched ingredients; optimized for weight management & overall gut health; promotes and maintains health weight levels while revitalizing your gut microflora for sustainable weight management; Enhances overall immune and gastrointestinal health, among other claims.

100.    The express warranties made to Plaintiffs and members of the Class appear on every Product label. This warranty regarding the nature of the Product marketed by Defendant specifically relates to the goods being purchased and became the basis of the bargain.

101.    Plaintiffs and the Class purchased the Products in the belief that they conformed to the express warranties that were made on the Products' labels.

102.    Defendant breached the express warranties made to Plaintiffs and members of the Class by failing to supply goods that conformed to the warranties it made. As a result, Plaintiffs and members of the Class suffered injury and deserve to be compensated for the damages they suffered.

103.    Plaintiffs and the members of the Class paid money for the Products. However, Plaintiffs and the members of the Class did not obtain the full value of the advertised Products. If Plaintiffs and other members of the Class had known of the true nature of the Products, they would not have purchased them or paid less for them. Accordingly, Plaintiffs and members of the Class have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

104.    Plaintiffs and the Class are therefore entitled to recover damages, punitive damages, equitable relief such as restitution and disgorgement of profits, and declaratory and injunctive relief.

## SECOND CAUSE OF ACTION
### ("Unlawful" Business Practices in Violation of
### The Unfair Competition Law ("UCL"), Bus. & Prof. Code §§17200, *et seq*.)
### By Plaintiff Luxton on Behalf of the California Subclass

105.    Plaintiff Luxton incorporates each and every allegation contained in the paragraphs above as if restated herein.

106.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code §17200.

107.    A business act or practice is "unlawful" if it violates any established state or federal law.

108.    Defendant's acts, omissions, misrepresentations, practices, and/or non-disclosures concerning the Products alleged herein, constitute "unlawful" business acts and practices in that they violate the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§301, et seq. and its implementing regulations, including, at least, the following sections:

a. 21 U.S.C. §343(a), which deems food misbranded when its labeling contains a statement that is false or misleading in any particular;

b. 21 C.F.R. §102.5(a)-(d), which prohibits the naming of foods so as to create an erroneous impression about the presence or absence of ingredient(s) or component(s) therein;

c. 21 U.S.C. §§331and 333, which prohibits the introduction of misbranded foods into interstate commerce.

d. 21 U.S.C. §342(g)(1) which deems a dietary supplement adulterated if it has been prepared, packed, or held under conditions that do not meet current good manufacturing practice regulations.

109.    California has expressly adopted federal labeling requirements as its own pursuant to the Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 et seq. (the "Sherman Law"), the Sherman Law, which provides that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state." Cal. Health & Safety Code § 110100.

110.    Each of Defendant's violations of federal law and regulations violates California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 et seq. ("Sherman Law"), including, but not limited to, the following sections:

111.    Section 110100 (adopting all FDA regulations as state regulations);

112.    Section 110290 ("In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these, shall be taken into account.");

113.    Section 110390 ("It is unlawful for any person to disseminate any false advertisement of any food. . . .  An advertisement is false if it is false or misleading in any particular.");

114.    Section 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.");

115.    Section 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

116.    Section 110400 ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . ."); and

117.    Section 110660 ("Any food is misbranded if its labeling is false or misleading in any particular.").

118.    Each of the challenged omissions, statements, and actions by Defendant violates the FDCA, and the Sherman Law, and, consequently, violates the "unlawful" prong of the UCL.

119.    Defendant's conduct is further "unlawful" because it violates California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq. (the "FAL"), California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq. (the "CLRA"), and breaches express warranty, as discussed in the claims above and below.

120.    By committing the unlawful acts and practices alleged above, Defendant has engaged, and continues to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§17200, *et seq.*

121.    In accordance with California Business & Professions Code Section 17203, and as Plaintiff lacks an adequate remedy at law, they seek an order enjoining Defendant from continuing to

conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

122. Through its unlawful acts and practices, Defendant has obtained, and continues to unfairly obtain, money from members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and all members of the Class, to disgorge the profits Defendants made on these transactions, and to enjoin Defendants from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an order is not granted.

## THIRD CAUSE OF ACTION

### ("Unfair" Business Practices in Violation of
### The Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*)
### By Plaintiff Luxton on Behalf of the California Subclass

123. Plaintiff Luxton incorporates each and every allegation contained in the paragraphs above as if restated herein.

124. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code §17200.

125. A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

126. Defendant has violated, and continues to violate, the "unfair" prong of the UCL through its misleading description of the Products. The gravity of the harm to members of the Class resulting from such unfair acts and practices outweighs any conceivable reasons, justifications, or motives of Defendant for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, Defendant had engaged, and continued to engage, in unfair business practices within the meaning of California Business and Professions Code §§17200, *et seq.*

127.    In accordance with California Business & Professions Code Section 17203, and as Plaintiff lacks an adequate remedy at law, they seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

128.    Through its unfair acts and practices, Defendant obtained, and continued to unfairly obtain, money from members of the Class. As such, Plaintiff has been injured and requests that this Court cause Defendant to restore this money to Plaintiff and the members of the Class, to disgorge the profits Defendant had made on its Products, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

## **FOURTH CAUSE OF ACTION**
### **("Fraudulent" Business Practices in Violation of**
### **The Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*)**
### **By Plaintiff Luxton on Behalf of the California Subclass**

129.    Plaintiff Luxton incorporates each and every allegation contained in the paragraphs above as if restated herein.

130.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

131.    A business act or practice is "fraudulent" under the Unfair Competition Law if it actually deceives or is likely to deceive members of the consuming public.

132.    Defendant's acts and practices of mislabeling its Products in a manner to suggest they principally contained their characterizing ingredients.

133.    As a result of the conduct described above, Defendant has been, and will continue to be, unjustly enriched at the expense of Plaintiff and members of the proposed Class. Specifically, Defendant has been unjustly enriched by the profits they have obtained from Plaintiff and the Class from the purchases of their Products.

134.    In accordance with California Business & Professions Code Section 17203, and as Plaintiff lacks an adequate remedy at law, they seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

135.    Through its fraudulent acts and practices, Defendant has improperly obtained, and continues to improperly obtain, money from members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and the Class, to disgorge the profits Defendant has made, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

## FIFTH CAUSE OF ACTION
**(False Advertising in Violation of
California Business & Professions Code §§ 17500, *et seq*.)
By Plaintiff Luxton on Behalf of the California Subclass**

136.    Plaintiff Luxton incorporates each and every allegation contained in the paragraphs above as if restated herein.

137.    Defendant uses advertising and packaging to sell its Products. Defendant disseminates advertising regarding its Products which by its very nature is deceptive, untrue, or misleading within the meaning of California Business & Professions Code §§17500, *et seq.* because those advertising statements contained on the labels are misleading and likely to deceive, and continue to deceive, members of the putative Class and the general public.

138.    In making and disseminating the statements alleged herein, Defendant knew or should have known that the statements were untrue or misleading, and acted in violation of California Business & Professions Code §§17500, *et seq*.

139.    The misrepresentations and non-disclosures by Defendant of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of California Business & Professions Code §§17500, *et seq*.

140.    Through its deceptive acts and practices, Defendant has improperly and illegally obtained money from Plaintiff and the members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and the members of the Class, and to enjoin Defendant from continuing to violate California Business & Professions Code §§17500, *et seq.*, as discussed above. Otherwise, Plaintiff and those similarly situated will continue to be harmed by Defendant's false and/or misleading advertising.

141.    Pursuant to California Business & Professions Code §17535, Plaintiff seeks an Order of this Court ordering Defendant to fully disclose the true nature of its misrepresentations. Plaintiff additionally requests an Order: (1) requiring Defendant to disgorge its ill-gotten gains, (2) award full restitution of all monies wrongfully acquired by Defendant and (3), interest and attorneys' fees. Plaintiff and the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

**SIXTH CAUSE OF ACTION**
**(Violation of the Consumers Legal Remedies Act,**
**California Civil Code §§ 1750, *et seq*.)**
**By Plaintiff Luxton on Behalf of the California Subclass**

142.    Plaintiff Luxton incorporates each and every allegation contained in the paragraphs above as if restated herein.

143.    This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq*. (the "CLRA").

144.    Plaintiff and each member of the proposed Class are "consumers" within the meaning of Civil Code §1761(d).

145.    The purchases of the Products by consumers constitute "transactions" within the meaning of Civil Code §1761(e) and the Products constitute "goods" within the meaning of Civil Code §1761(a).

146.    Defendant has violated, and continues to violate, the CLRA in at least the following respects:

---

a. §1770(5) pertaining to misrepresentations regarding the characteristics of goods sold—specifying that misleading representations regarding ingredients violate the CLRA;

b. §1770(7) pertaining to misrepresentations regarding the standard, quality, or grade of goods sold; and

c. § 1770(9) pertaining to goods advertised with the intent not to provide what is advertised.

147. Defendant knew, or should have known, that the labeling of their Products violated consumer protection laws, and that these statements would be relied upon by Plaintiff and the members of the Class.

148. The representations were made to Plaintiff and all members of the Class. Plaintiff relied on the accuracy of the representations on Defendant's labels which formed a material basis for his decision to purchase the Products. Moreover, based on the very materiality of Defendant's misrepresentations uniformly made on or omitted from their Product labels, reliance may be presumed or inferred for all members of the Class.

149. Defendant carried out the scheme set forth in this Complaint willfully, wantonly, and with reckless disregard for the interests of Plaintiff and the Class, and as a result, Plaintiff and the Class have suffered an ascertainable loss of money or property.

150. Plaintiff and the members of the Class request that this Court enjoin Defendant from continuing to engage in the unlawful and deceptive methods, acts and practices alleged above, pursuant to California Civil Code §1780(a)(2). Unless Defendant is permanently enjoined from continuing to engage in such violations of the CLRA, future consumers of Defendant's Products will be damaged by their acts and practices in the same way as have Plaintiff and the members of the proposed Class.

151. In conjunction with the filing of this Complaint, Plaintiff served a CLRA demand pursuant to Civil Code §1782, via U.S. Certified Mail Return Receipt notifying Defendant of the conduct described herein and that such conduct was in violation of particular provisions of Civil Code §1770. If Defendant fails to provide the requested relief within 30 days of receipt of the Demand, Plaintiffs will amend their Complaint to seek damages as provided under Civil Code §1780.

1

2

3

4

5

**SEVENTH CAUSE OF ACTION**

**(Violation of New York's Consumer Protection from Deceptive Acts and Practices Law**

**N.Y. GEN. BUS. LAW § 349 *et seq.*)**

**By Plaintiff Phan on behalf of the New York Subclass**

6       152.    Plaintiff Phan incorporates each and every allegation contained in the paragraphs

7   above as if restated herein. Plaintiff Phan brings this claim on behalf of the New York Subclass for

8   violation of section 349 of New York's Consumer Protection from Deceptive Acts and Practices

9   Law, N.Y. GEN. BUS. LAW § 349 *et seq.*

10       153.    Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business,

11   trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. GEN. BUS.

12   LAW § 349(a).

13       154.    BB's labeling and marketing of Provitalize, as alleged herein, constitute "deceptive"

14   acts and practices, as such conduct misled Plaintiff Phan and the New York Subclass as to the

15   characteristics and value of the Products.

16       155.    Subsection (h) of Section 349 grants private plaintiffs a right of action for violation of

17   New York's Consumer Protection from Deceptive Acts and Practices Law, as follows:

18

19
      In addition to the right of action granted to the attorney general pursuant to
20    this section, any person who has been injured by reason of any violation of
      this section may bring an action in his own name to enjoin such unlawful
21    act or practice, an action to recover his actual damages or fifty dollars,
      whichever is greater, or both such actions. The court may, in its discretion,
22    increase the award of damages to an amount not to exceed three times the
      actual damages up to one thousand dollars, if the court finds the defendant
23    willfully or knowingly violated this section. The court may award
      reasonable attorney's fees to a prevailing plaintiff.
24
   N.Y. GEN. BUS. LAW § 349(h).

25       156.    In accordance with subsection (h) of Section 349, Plaintiff Phan seeks an order

26   enjoining BB from continuing the unlawful deceptive acts and practices set out above. Absent a

27   Court order enjoining the unlawful deceptive acts and practices, BB will continue its deceptive and

28

misleading marketing campaign and, in doing so, irreparably harm each of the New York Subclass members. As a consequence of BB's deceptive acts and practices, Plaintiff Phan and other members of the New York Subclass suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff Phan and other members of the New York Subclass also seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages. N.Y. GEN. BUS. LAW § 349(h).

## EIGTH CAUSE OF ACTION

**(Violation of New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. GEN. BUS. LAW § 350 *et seq.*)**

**By Plaintiff Phan on Behalf of the New York Subclass**

157.    Plaintiff Phan incorporates each and every allegation contained in the paragraphs above as if restated herein. Plaintiff Phan brings this claim on behalf of the New York Subclass for violation of section 350 of New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. GEN. BUS. LAW § 350.

158.    Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. GEN. BUS. LAW § 350.

*159.*    New York General Business Law Section 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. GEN. BUS. LAW § 350-a.1. The section also provides that advertising can be false by omission, as it further defines "false advertising" to include "advertising [that] fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates." *Id.*

160.    BB's labeling, marketing, and advertising of its Bar, as alleged herein, is "misleading in a material respect" and, thus, constitutes "false advertising," as it falsely represents the Products as consisting of characteristics and lawfulness that they do not possess.

161.    Plaintiff Phan seeks an order enjoining BB from continuing this false advertising. Absent enjoining this false advertising, BB will continue to mislead Plaintiff Phan and the other

members of the New York Subclass as to the characteristics of its Products, and in doing so, irreparably harm each of the New York Subclass members.

162. As a direct and proximate result of BB's violation of New York General Business Law §350, Plaintiff Phan and the other members of the New York Subclass have also suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff Phan and other members of the New York Subclass also seek actual damages or statutory damages of $500 per violation, whichever is greater, as well as punitive damages. N.Y. GEN. BUS. LAW § 350-e.

## NINTH CAUSE OF ACTION
### (Restitution Based On Quasi-Contract/Unjust Enrichment)
### By Plaintiffs on Behalf of the Nationwide Class

163. Plaintiffs incorporate each and every allegation contained in the paragraphs above as if restated herein.

164. Defendant's conduct in enticing Plaintiffs and the Class to purchase its Products with false and misleading packaging is unlawful because the statements contained on the Defendant's Product labels are untrue.

165. Defendant took monies from Plaintiffs and the Class for these Products and have been unjustly enriched at the expense of Plaintiffs and the Class as result of their unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on Defendant to restore these ill-gotten gains to Plaintiffs and the Class.

166. It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiffs and Class members.

167. As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs and the Class are entitled to restitution or restitutionary disgorgement in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

THEREFORE, Plaintiffs, on behalf of themselves and on behalf of the other members of the Class and for the Counts so applicable on behalf of the general public request an award and relief as follows:

A.     An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs be appointed Class Representatives, and Plaintiffs' counsel be appointed Lead Counsel for the Class.

B.     Restitution in such amount that Plaintiff and all members of the Class paid to purchase Defendant's Product or restitutionary disgorgement of the profits Defendant obtained from those transactions, for Causes of Action for which they are available.

C.     Compensatory damages for Causes of Action for which they are available.

D.     Other statutory penalties for Causes of Action for which they are available.

E.     Punitive Damages for Causes of Action for which they are available.

F.     A declaration and Order enjoining Defendant from marketing and labeling its Product deceptively, in violation of laws and regulations as specified in this Complaint.

G.     An Order awarding Plaintiffs8 their costs of suit, including reasonable attorneys' fees and pre and post judgment interest.

H.     An Order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Defendant as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein.

I.     Such other and further relief as may be deemed necessary or appropriate.

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF

1

## <u>DEMAND FOR JURY TRIAL</u>

2

Plaintiffs hereby demand a trial by jury on all causes of action or issues so triable.

3

4

DATED: May 8, 2025                        Respectfully submitted,

5

6

7

_____
Michael D. Braun
**KUZYK LAW, LLP**

8

9

2121 Avenue of the Stars, Ste. 800
Los Angeles, California 90067
Telephone:     (213) 401-4100
Facsimile:     (213) 401-0311
Email:    mdb@kuzykclassactions.com

10

11

*Counsel for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28